T.C. Memo. 2011-60

UNITED STATES TAX COURT

ESTATE OF SYLVIA RIESE, DECEASED, ELLEN C. GRIMES AND JUDITH A.
ZIPP, EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5388-08.                     Filed March 15, 2011.

<u>T. Randolph Harris</u>, for petitioner.

<u>Monica E. Koch</u>, <u>Thomas J. Kerrigan</u>, and <u>Brian David Hans</u>,

for  respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $3,114,357

deficiency in the Federal estate tax of the Estate of Sylvia

Riese (the estate).  The issues for decision are whether:  (1)

The value of a personal residence transferred by Sylvia Riese

(decedent) to a qualified personal residence trust (QPRT) that terminated 6 months before decedent's death is included in the value of decedent's gross estate pursuant to section 2036;[1] (2) investment management fees of $125,000 paid by the estate are deductible administrative expenses pursuant to section 2053; (3) accrued rent of $46,298 is deductible as a debt of decedent pursuant to section 2053; and (4) the estate is entitled to a deduction of $46,452 for unpaid rent owed as an administrative expense pursuant to section 2053.

## FINDINGS OF FACT

Decedent was a resident of New York when she passed away. Her daughters, Ellen C. Grimes (Mrs. Grimes) and Judith A. Zipp (Ms. Zipp), were appointed coexecutors of the estate by letters testamentary issued on March 10, 2004.[2] Both resided in New York when the petition was filed.

Decedent was wealthy and received substantial financial and tax planning advice in her later years. She inherited her home at 35 Tideway in Kings Point, New York (the residence), by operation of law when her husband, with whom she lived and owned

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Mrs. Grimes and Ms. Zipp also served as attorneys-in-fact for decedent while she was alive pursuant to powers of attorney decedent executed on Nov. 30, 1993, and Mar. 14, 2003.

a tenancy by the entirety in the home, passed away in 1990. She also inherited her husband's fortune, which he had accumulated over the years as cofounder of the popular Riese restaurant chain.

Ms. Zipp lived 10 to 15 minutes from decedent. They had a wonderful relationship, and Ms. Zipp spent a lot of time taking care of decedent in decedent's last few years. However, Ms. Zipp trusted her sister, Mrs. Grimes, to care for decedent's financial matters.

Robert S. Grimes (Mr. Grimes), decedent's son-in-law,[3] provided investment management services to decedent through his company, R.S. Grimes & Co. (RSG&C). Stefan F. Tucker (Mr. Tucker), an attorney and partner in the firm of Venable LLP (Venable),[4] provided estate planning advice to Mr. and Mrs. Grimes[5] and began advising decedent around 1993. RSG&C watched over decedent's investments and assisted Mr. Tucker with decedent's estate planning. According to Mr. Tucker, Mr. Grimes "gathered resources, brought in counsel and did everything he

---

[3] Mr. Grimes is Mrs. Grimes' husband.

[4] For several years Mr. Tucker advised decedent as a member of Tucker, Flyer, Sanger, Rider, and Lewis, P.C. On Jan. 1, 2000, Tucker Flyer merged with Venable, Mr. Tucker's current firm, and Mr. Tucker continued to advise decedent as a member of Venable.

[5] Mr. Grimes and Mr. Tucker met in 1974 and worked on several transactions together throughout the years.

could under R.S. Grimes & Co. to watch over and work on and save as much of * * * [decedent's] assets as he could". Decedent paid RSG&C an annual fee of $125,000 for its investment management services from around 1990 until she died.

Mr. Tucker represented decedent with regard to estate planning and other matters.[6] In 1999 Mrs. Grimes mentioned to him that decedent was agreeable to some additional estate planning with respect to the residence. In response, Mr. Tucker and Mrs. Grimes began considering the establishment of a QPRT for decedent. Mr. Tucker sent a letter dated September 17, 1999, to Mrs. Grimes explaining the Federal gift tax costs and some of the benefits of establishing a QPRT for decedent. Mrs. Grimes then visited decedent and explained the contents of the letter to her. Decedent asked Mrs. Grimes whether she would directly benefit from the establishment of a QPRT. Mrs. Grimes explained that establishing a QPRT would result in a lower estate tax liability but also that decedent would have to pay gift tax on the transfer and pay rent to live in the residence after the QPRT expired. Decedent agreed that a QPRT would be acceptable and gave Mrs. Grimes permission to proceed.

---

[6] Mr. Tucker is admitted to the bar of the District of Columbia. His areas of practice include real estate, taxation, and estate planning, and he is a former chair of the American Bar Association Section of Taxation.

On February 7, 2000, Mr. Tucker met with Mr. and Mrs. Grimes at their residence to discuss the QPRT and other estate planning options for decedent. At the meeting they agreed that a QPRT would be the best alternative for keeping the value of the residence out of decedent's gross estate because decedent would not have to give up any liquid assets.[7] After explaining the details of a QPRT to Mr. and Mrs. Grimes, Mr. Tucker excused himself, went to Mr. Grimes' library, and called decedent at her home.[8] During this call Mr. Tucker explained to decedent some of the specifics about the QPRT; specifically, that upon termination decedent would no longer own the residence and would have to pay rent if she remained in the residence. After Mr. Tucker had explained everything decedent agreed to establish a QPRT.

Following the meeting Mr. Tucker sent a letter dated February 22, 2000, to decedent, courtesy of Mrs. Grimes, explaining to decedent, inter alia, that she would have to pay to her daughters fair market rent if she continued to live in the residence after the QPRT terminated. Mrs. Grimes and decedent

---

[7] At the time of her death decedent had over $5 million in liquid assets. Other planning devices, such as a family limited partnership, would have required decedent to give up some of these assets.

[8] Respondent disputes the occurrence of this conversation because Mr. Tucker did not memorialize it in his notes or billing records and Mrs. Grimes did not specifically remember Mr. Tucker's calling decedent. However, Mr. Tucker credibly testified that he called decedent and discussed the QPRT with her.

discussed this letter, and Mrs. Grimes again helped decedent understand the details. Mr. Tucker also sent drafts of QPRT agreements for 3- and 5-year terms to decedent. Decedent ultimately decided to create a 3-year QPRT.

On April 19, 2000, decedent established the Sylvia Riese QPRT (the QPRT) under section 25.2702-5, Gift Tax Regs., and executed a deed transferring the residence thereto. Decedent reported the transfer of the residence to the QPRT on Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for tax year 2000.

The QPRT agreement states, in pertinent part, that if the settlor (i.e., decedent) survives the termination date of the QPRT, the QPRT shall terminate and the balance of the trust fund (i.e., the residence) shall be distributed 50 percent each to two trusts, known as the 1997 Property Trusts (the Property Trusts), which decedent established in 1996 for the benefit of Mrs. Grimes and Ms. Zipp. The QPRT terminated by its terms on April 19, 2003. Decedent (or the QPRT) did not execute a deed transferring the residence to the Property Trusts.

Mrs. Grimes never discussed rent directly with decedent after the QPRT terminated. However, around the termination date Mrs. Grimes called Mr. Tucker inquiring about how to determine the proper amount of rent to charge decedent. She testified: "I knew she'd agreed to it and, you know, I didn't--I didn't want to

feel like I was badgering her.  And so I called * * * [Mr. Tucker]."  Mr. Tucker explained to her that fair market rent could be determined by contacting local real estate brokers and that this could be done by the end of the year (i.e., December 31, 2003).  Mr. Tucker entered a "tickler" in his pocket calendar to remind himself to call Mrs. Grimes by Thanksgiving to make sure everything was taken care of.  However, before Thanksgiving arrived decedent suffered a stroke and died unexpectedly on October 26, 2003.[9]

Decedent continued to live in the residence until she died.  During the 6-month period from the QPRT's termination until decedent's death, decedent continued to pay all of the property taxes, insurance, upkeep, and maintenance on the residence.  She did not pay rent or execute a written lease or rental agreement with the Property Trusts.

At the time of decedent's death Mrs. Grimes had not yet determined the fair market rent.  When asked why, she responded: "Distractions, * * * [Mr. Tucker] said it wasn't--just as long as it was handled and in place and all of that stuff, you know, well before year end or near year end, that we would be okay.  And I

---

[9]  Although decedent was 83 and suffered from normal ailments associated with her age, her death was unexpected. Decedent's death certificate lists as her immediate cause of death cardiopulmonary (cardiac) arrest caused by a cerebrovascular accident (stroke) she had suffered days earlier.

thought I had more time than I wind [sic] up having." When pressed further on recross she said: "I just didn't do it".

After decedent's death the estate assumed responsibility for and paid all property taxes, insurance, upkeep, and maintenance on the residence until it was sold on October 6, 2004. The Property Trusts did not maintain homeowners insurance for the residence nor directly pay any of the foregoing expenses.

On January 24, 2005, Mrs. Grimes and Ms. Zipp filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, for the estate.[10] The estate did not include the value of the residence in the calculation of decedent's gross estate. The estate claimed as a deduction under section 2053 a debt of $46,298 owed to the Property Trusts for net fair market rent of $7,500 per month from the date the QPRT terminated until decedent's death. The estate also claimed as deductions under section 2053 administration expenses payable to the Property Trusts of $46,452 for net fair market rent of $7,500 per month from the day after decedent's death through April 30, 2004, and $125,000 for "investment management fees" paid to RSG&C.

Respondent examined the estate tax return and included in the gross estate the value of the residence, alleged to be

---

[10] The estate timely filed for an extension and made a $2,975,000 Federal estate tax payment on July 26, 2004.

$6,138,000.[11]  Respondent also denied the deductions for predeath and postdeath rent as well as the investment management fees.

OPINION

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Section 2051 defines the taxable estate as "the value of the gross estate" less applicable deductions.  Section 2031(a) specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2046.  Section 2033 broadly provides:  "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."  Sections 2034 through 2046 explicitly mandate the inclusion of several more narrowly defined classes of interests in property.  Among those specific sections is section 2036, which provides, in pertinent part, as follows:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide

---

[11]  Respondent determined that the residence is includable in the gross estate at the sale price of $6,820,000 less a 10-percent discount for postdeath appreciation.  The estate disputes the determined value of the residence.  However, the Court deferred the valuation issue.  On the basis of our holding herein, a trial on the issue of valuation will not be necessary.

sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

    (1) the possession or enjoyment of, or the right to the income from, the property, or

    (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Section 20.2036-1(c)(1)(i), Estate Tax Regs., further explains:  "An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred."[12]  Whether there existed an implied agreement depends on the facts and circumstances of each transaction and case.

Respondent argues that an implied agreement can be inferred from the fact that "nothing changed after the QPRT expired". Decedent continued to live in the residence without executing a lease or paying rent.  Respondent urges us to follow the reasoning in Guynn v. United States, 437 F.2d 1148 (4th Cir.

_____

[12]  During the audit years the identical language was contained in sec. 20.2036-1(a), Estate Tax Regs.  The language was moved to sec. 20.2036-1(c)(1)(i), Estate Tax Regs., by T.D. 9414, 2008-35 I.R.B. 454, 458, and that provision is applicable to estates of decedents dying after Aug. 16, 1954.  See sec. 20.2036-1(c)(3), Estate Tax Regs.

1971), and hold that decedent retained for life an interest in the residence.

The estate, relying primarily on Estate of Barlow v. Commissioner, 55 T.C. 666 (1971), argues that there was no understanding, express or implied, that decedent would remain in the residence for life without paying rent. Decedent always intended to pay rent, and the trustees of the Property Trusts intended to enforce decedent's obligation. However, actual payment of rent never materialized because of decedent's unexpected death 6 months after the QPRT terminated.

We do not find either case relied upon by the parties to be squarely on point. In Estate of Barlow the decedent and his wife conveyed farm property to their four children, simultaneously leasing the property back for an amount that was found to be fair market rent. Pursuant to the lease, the lessee was responsible for the taxes and the amount would be credited towards the rent. The lessees paid rent into a trust account for the children's benefit for the first 2 years. The lessors reported the rent as income. Because of the health of the decedent and other personal problems of one of the children, rent payments ceased after the first 2 years and the balance was paid in a lump sum upon the decedent's death 4 years later. The value of the property was not included in the taxable estate even though for 4 years the decedent did not actually pay the rent. The Court found that the

outright transfer of the property to the children and the leaseback were bona fide transactions.  The forbearance from collecting rent was due to circumstances that arose later and were not contemplated by the parties at the time of the transaction.

The Court held that the decedent in Estate of Barlow transferred the property without retaining a life estate.  The parties executed a lease, and rent was properly paid and reported for 2 years.  Rent payments ceased because of later unforseen circumstances; there was no understanding at the time of the transfer that rent would not be paid.  In the case at hand, decedent never executed a lease or made any rent payments during the 6-month period after the QPRT terminated.  While this alone is not determinative, as will be discussed below, the circumstances differ enough that we decline to directly apply the reasoning in Estate of Barlow.

In Guynn v. United States, supra, an elderly woman named Mrs. Calvert purchased and moved into a home near where her daughter lived.  Four months later she conveyed the property to her daughter but continued to live there.  Mrs. Calvert remained in the home for an additional year and 3 months after executing the deed transferring the house to her daughter without an

express agreement entitling her to do so.[13]  During that time she paid no rent to her daughter but paid for improvements to the property and certain expenses.  Mrs. Calvert's daughter testified that Mrs. Calvert's remaining in the property was not discussed because it was understood by all involved that she would stay in the home until her death.[14]  The Court of Appeals for the Fourth Circuit held that the value of the property was included in the gross estate on the basis of an implied agreement for a retained life estate.

In Estate of Tehan v. Commissioner, T.C. Memo. 2005-128, the decedent gradually conveyed more and more of his interest in his home to his eight children until his interest eventually reached zero percent.[15]  Pursuant to an express agreement with his children,[16] the decedent had "'the sole and exclusive right to

---

[13]  Mrs. Calvert occupied the property from the date of original purchase on Dec. 29, 1961, until her death on Aug. 10, 1963.  On May 2, 1962, Mrs. Calvert, along with the original sellers of the property, executed a deed for the property to her daughter.

[14]  Presumably rent too was not discussed.

[15]  Mr. Tehan purchased the condominium in 1990.  He executed deeds on Nov. 5, 1997, Jan. 2, 1998, and Mar. 22, 1999, conveying to his eight children, in fee simple and as tenants in common, an undivided 4.5-percent interest, an undivided 4.5-percent interest, and an undivided 3.5-percent interest, respectively, leaving his percentage interest in the property at zero after the third transfer.  He died on May 17, 1999.

[16]  The decedent and his children executed the agreement on Nov. 5, 1997, the same date he executed the first of the three deeds.

the use and occupancy of the Property for such period of time as he desires'" and "'shall not pay any rent, but shall be solely responsible for the payment of [other expenses]'".[17]  We held that the decedent retained a life estate in his residence during the period from November 5, 1997, until the date of his death and that he retained possession and enjoyment of his residence within the meaning of section 2036(a)(1).[18]

The transfers in Guynn v. United States, 437 F.2d 1148 (4th Cir. 1971), and Estate of Tehan were direct gifts with no discussion whatsoever of the payment of rent to allow the grantor to remain in the property.  Estate of Tehan is an example of an express understanding and Guynn an example of an implied understanding that the grantor would retain an interest in the transferred property for life.  To the contrary, decedent

---

[17]  Other expenses included mortgages, condominium assessments, real estate taxes, insurance premiums, and costs associated with maintenance and repair.

[18]  With respect to the decedent's reliance on Estate of Barlow v. Commissioner, 55 T.C. 666 (1971), in Estate of Tehan v. Commissioner, T.C. Memo. 2005-128, we said:

> The estate's reliance on [Estate of Barlow] is misplaced.  In Estate of Barlow, the decedent involved there and his wife gratuitously transferred a farm to their children and, under a contemporaneously executed lease, retained the possession and enjoyment of that farm in return for the payment by them of a "fair, customary rental".  In the instant case, the * * * agreement was not a lease agreement, and decedent did not agree under that agreement to pay any rent, let alone fair rental value, for his possession and enjoyment of decedent's residence. [Internal citations and fn. refs. omitted.]

executed a QPRT agreement and rent was discussed on multiple occasions (e.g., when Mrs. Grimes explained the September 17, 1999, letter to decedent, during the February 7, 2000, phone call between Mr. Tucker and decedent, in the February 22, 2000, letter to decedent, and during subsequent conversations, etc.). Decedent agreed to pay rent and the trustees of the Property Trusts to which the residence transferred expected and intended to collect rent after the QPRT terminated. Furthermore, Mrs. Grimes' call to Mr. Tucker upon the QPRT's termination to find out how to determine fair market rent negates any possibility of an implied understanding that decedent would retain an interest in the residence for life. While counsel's advice to determine rent by the end of the year was not the most prudent course of action, i.e., executing a lease and determining rent before the QPRT terminated would have been ideal, we accept the parties' good faith testimony that they intended to determine rent by the end of the year.

We find as a matter of fact that there was an agreement among the parties for decedent to pay fair market rent, the amount of which was to be determined and payments to begin by the end of 2003. See Diaz v. Commissioner, 58 T.C. 560, 565 (1972) (basing analysis upon evaluation of the entire record and credibility of witnesses). The Secretary had not issued any regulations or guidance as to how and when rent should be paid

upon the termination of a QPRT.  We believe that doing so by the end of the calendar year in which the QPRT expired would have been reasonable under the circumstances.

Unlike many cases involving the transfer of a personal residence where the decedent continued to live in the residence until death, see, e.g., Estate of Van v. Commissioner, T.C. Memo. 2011-22, the existence of an implied agreement in this case is negated by the express agreement among the parties for the payment of rent.  Many factors, e.g., the creation of the QPRT, the payment of gift tax upon the transfer of the residence to the QPRT, the several instances in which decedent agreed to pay rent, the fact that Mrs. Grimes called Mr. Tucker upon the QPRT's termination to find out how to determine the amount of rent to charge, and Mr. Tucker's corroborating testimony, all lead us to find that there was no agreement or understanding that decedent would retain an interest in the residence for life without paying rent.

We believe that Mrs. Grimes, on the advice of counsel, intended to and would have determined fair market rent by the end of 2003 and decedent would have paid rent.  We believe further that Mr. Tucker would have made sure a lease was executed, rent was determined, and all appropriate changes were made to effect the change of ownership.  Unfortunately, decedent died unexpectedly in October before any of this occurred.

On our examination of the entire record, we find that under the facts of this case decedent did not retain a life estate in the residence. There was no understanding, express or implied, at the time of transfer that decedent could occupy the residence rent free. Accordingly, the value of the residence was properly excluded from the gross estate and respondent's determination is not sustained on this issue.

Deduction for Accrued Rent

Section 2053(a)(3) provides for a deduction from the gross estate for claims against the estate. To be deductible, a claim must be allowable under the laws of the State in which the estate is administered. Only claims that are "enforceable against the decedent's estate" and only those amounts that "represent personal obligations of the decedent existing at the time of his death" are deductible. Sec. 20.2053-4, Estate Tax Regs.

Although decedent had not entered into a lease with the Property Trusts and specific terms were not determined until after her death, decedent's occupation of the residence constituted a tenancy-at-will recognized under New York law. See N.Y. Real Prop. Law sec. 228 (McKinney 2006); Talamo v. Spitzmiller, 23 N.E. 980 (N.Y. 1890). Decedent therefore had a personal obligation to pay rent and was indebted to the Property Trusts at the time she died. Accordingly, the estate is entitled to a deduction for accrued rent as a debt of the decedent.

Deduction for Unpaid Rent and Investment Management Fees

Section 2053(a)(2) provides that "the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts * * * for administration expenses * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered."  Section 20.2053-3(a), Estate Tax Regs., provides, in pertinent part:  "The amounts deductible from * * * [the] gross estate as 'administration expenses' * * * are limited to such expenses as are actually and necessarily incurred in the administration of the decedent's estate".  See also Estate of Todd v. Commissioner, 57 T.C. 288, 296 (1971).

The estate argues that it was reasonable for the estate to occupy the residence for a short period after decedent's death and that it properly owes rent to the Property Trusts on the basis of decedent's obligation to pay rent.  However, as there was no formal lease between the Property Trusts and decedent, the tenancy-at-will ceased upon decedent's death.  The estate did not require a roof over its head and was not obligated to pay rent to the Property Trusts.  See Fried v. Commissioner, 445 F.2d 979, 985 (2d Cir. 1971) (the estate failed to adequately prove an obligation to pay rent for 3 months following the decedent's death in the absence of a valid lease), affg. 54 T.C. 805 (1970).

Next, the estate argues that the $125,000 paid to decedent's son-in-law for services provided by RSG&C was a reasonable and necessary expense because Mr. Grimes had extensive knowledge of decedent's assets because of his previous service to her. However, the estate failed to introduce any evidence of the services RSG&C provided to the estate. Mr. Tucker testified that he was unsure of exactly what services RSG&C provided to the estate, and Mr. Grimes did not testify at all. We believe the estate has failed to adequately explain the services RSG&C provided to the estate and has not shown that $125,000 was a reasonable and necessary expense. Accordingly, respondent's determination with respect to the investment management fees is sustained.

## Conclusion

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered
under Rule 155.