# United States Tax Court

158 T.C. No. 2

ESTATE OF MARION LEVINE, DECEASED, ROBERT L. LARSON,
PERSONAL REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 13370-13.                    Filed February 28, 2022.

———————

D, the deceased, entered into split-dollar life-insurance arrangements which required her revocable trust to pay premiums for life-insurance policies taken out on the lives of her daughter and son-in-law. When the arrangements terminate, D's revocable trust has the right to be paid the greater of the premiums paid or the cash surrender value of the policies. An irrevocable life-insurance trust was the owner of these policies. D's children and grandchildren were the beneficiaries of the irrevocable trust, and F, a family friend who was substantially involved in the family's businesses, was the sole member of the investment committee that managed the irrevocable trust. F and two of D's children also acted as D's attorneys-in-fact and as the revocable trust's successor cotrustees. As the sole member of the irrevocable trust's investment committee, only F had the right to prematurely terminate the life-insurance policies: the arrangements gave D and the other two attorneys-in-fact no rights to terminate the policies or the arrangement itself.

1. *Held*: Treasury Regulation § 1.61-22 governs only the gift-tax consequences of this transaction.

2. *Held*, *further*, as of the date of her death, D possessed a receivable created by the arrangements, which was only the right to receive the greater of premiums paid or the cash surrender values of the policies when they are terminated.

3. *Held*, *further*, I.R.C. §§ 2036(a)(2) and 2038 do not require inclusion of the policies' cash-surrender values because D did not have any right, whether by herself or in conjunction with anyone else, to terminate the policies because only the irrevocable trust had that right.

4. *Held*, *further*, I.R.C. § 2703 applies only to property interests that D held at the time of her death. There were no restrictions on the split-dollar receivable, so I.R.C. § 2703 is inapplicable.

––––––––––

*G. Michelle Ferreira*, *Brooke D. Anthony*, and *Joseph W. Anthony*, for petitioner.

*Randall L. Eager*, for respondent.

OPINION

HOLMES, *Judge*: Marion Levine entered into a complex transaction in which her revocable trust paid premiums on life-insurance policies taken out on her daughter and son-in-law that were held by a separate and irrevocable life-insurance trust. Levine's revocable trust had the right to be repaid for those premiums. Levine has since died, and the question is what has to be included in her taxable estate because of this transaction—is it the value of her revocable trust's right to be repaid in the future, or is it the cash-surrender values of those life-insurance policies right now?

We considered aspects of similar transactions both in *Estate of Morrissette v. Commissioner*,[1] and in *Estate of Cahill v. Commissioner*,[2]

––––––––––

[1] 146 T.C. 171 (2016).

[2] 115 T.C.M. (CCH) 1463 (2018).

but in this one we have novel questions of how to decide what the revocable trust transferred before Levine's death and what it held when she died.

*Background*

Levine was born in St. Paul, Minnesota in 1920. She lived there with her nine brothers and sisters through the Great Depression until she married George Levine. They were of the Greatest Generation, and Levine followed her new husband as best she could even after he was drafted into service. He served honorably, and when we had won, he and she made their way back to St. Paul. They enlisted together in the ensuing baby boom, and had two children—Nancy and Robert. Nancy married Larry Saliterman, and they themselves had three children: Scott, P.J., and Jonathan. Robert has two of his own: Charles and Michel. A family tree may be helpful here:



Marion Levine (d. 2009) -- George Levine (d. 1974)

Nancy

Scott    P.J.    Jonathan

Robert

Charles    Michel

George died in 1974, and Levine married Henry Orenstein sometime in the 1980s. This marriage lasted only a year before it ended in divorce. Levine then married Harold Frishberg around 1990, and they remained married until his death in 2005.

I.    *Levine's Business Success*

A.    *Humble Beginnings*

Levine graduated from high school and received some business-school training, but never earned a college degree. At a time when it was especially unusual, she nevertheless became a highly successful businesswoman. Her success began in 1950 when the Levines opened Penny's Supermarket. This small family business eventually grew to a 27-store, multimillion-dollar company. Levine did almost everything at Penny's—she collected timecards, oversaw payroll, paid bills, and tracked inventory. She became the sole boss after George died, until after more than three decades of minding the store, she sold the business

for $5 million in 1981. The proceeds did not become a nest egg for a comfortable retirement; Levine used them instead as capital to hatch new businesses that increased her net worth to $25 million over the next twenty years.

B.   *After Penny's*

None of these new businesses had anything to do with groceries. They were real-estate investments, a stock portfolio that she had begun in the early '60s and tended herself, interests in two Renaissance fairs and several mobile-home parks, and loans to real-estate partnerships and mobile-home park residents.

1.   *Real Estate Investments*

Most of Levine's real-estate investment activity was as a lender. Levine, her close personal friend Bob Larson, Larry, and Robert created two companies named 5005 Properties and 5005 Finance to manage all the real-estate ventures.[3]  Larson, Larry, and Robert managed the day-to-day business for these properties, while Levine mostly supplied the financing.  One of Levine's biggest and most profitable assets in her real-estate portfolio was Penn Lake Shopping Center, LLC (Penn Lake).  She and her late husband had built Penn Lake in 1959, and by 2007 the property was free of debt and produced approximately $200,000 in annual income.

2.   *Mobile Home Parks*

Levine owned several mobile-home parks through 5005 Properties.  This business began in 1979 when she bought a mobile-home park in Dayton, Minnesota.  These investments settled into a simple pattern:  5005 Properties would buy the property and rent spaces to residents.  At the height of this business, 5005 Properties owned 30 mobile-home parks, but its portfolios had shrunk.  Banks had stopped financing mobile homes after enactment of reform legislation,[4] so 5005

---

[3] 5005 was the address of the office building that used to house Penny's business.

[4] Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), manufactured-home loans were classified as "high cost."  The Act also classified manufactured-home retailers as "mortgage originators."  A widely reported, if unintended, consequence was that almost all lenders chose to stop making these loans.  *See The Impact of Dodd-Frank's Home Mortgage*

Finance itself stepped in and got extra revenue from lending to prospective residents. Many of these tenants had low credit scores, but 5005 knew its tenants and with some care could lend them money to buy their homes at rates they could afford. Levine took pride in avoiding evictions and was pleased when the tenants' improved scores let them climb the ownership ladder up to "stick-built" homes.

### 3. *Renaissance Fairs*

Levine also began to invest at some point in Renaissance fairs. These are a bit like state fairs, if the state were a small principality in fifteenth-century Europe populated entirely by modern people who enjoy costumed role-playing and adding extra "e's" to words like "old" and "fair." There are 20 major Renaissance fairs around the country, and 5005 Properties owns and runs 2 of them—the Arizona and Carolina Renaissance Festivals (the latter in North Carolina). Levine entered the business in 1988 and her festivals were generally open 7-8 weekends a year. Each festival is a small business. 5005 Properties charges admission, sells food and drinks for all concessions, contracts with skilled craftsmen and entertainers, and buys advertising to make it all profitable.

## II. *Family and Business Dynamics*

Levine's entrepreneurial success allowed her to support her children. Nancy graduated from the University of Minnesota in 1967 with a major in English literature and minors in humanities and art history. She worked mainly in different retail jobs after college (including at Penny's for a short time), but for the most part was not active in the family businesses.

Her brother Robert, on the other hand, became deeply involved early on and remains so today. He graduated from the Wharton School of Business with a degree in economics and a major in accounting and finance. He then went on to get his J.D. from the University of Colorado

---

*Reforms: Consumer and Market Perspectives: Hearing Before the Subcomm. on Fin. Insts. and Consumer Credit of the Comm. on Fin. Servs.*, 112th Cong. 10-11 (2012) (statement of Tom Hodges, General Counsel, Clayton Homes, Inc., on behalf of the Manufactured Housing Institute). Congress later amended the Truth in Lending Act to solve this problem. *See* Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174, 132 Stat. 1296 (2018).

Law School in 1977. He is still a member of the Minnesota bar, although he has not practiced since the mid-1980s.

He also seems to have inherited his parents' business acumen. He acquired his first piece of real estate—the Time Square Shopping Center in Minnesota—in 1974 upon his father George's death. He got involved in the purchase of Levine's first mobile-home park in 1979 and even worked at Penny's for about two years until its sale in 1981. He now works at 5005 Properties, where he is an astute manager of the Levine family's investments.

As the turn of the millennium neared, Levine began to plan for her own old age. She gave both of her children a statutory power of attorney in 1996 to take care of her affairs if something happened. But Nancy and Robert have not always gotten along, so Levine thought it was necessary to have a third attorney-in-fact to play the referee. This role was played by Bob Larson.

Larson is a Vietnam-era Marine who earned an accounting degree in 1966. He was working two different accounting jobs when his career—and his life—changed after meeting Levine in 1969. Larson's wife was Levine's hair dresser, and the Larsons got invited to Nancy and Larry's wedding. After meeting Levine at the wedding, Larson ran into her again while she was getting her hair done at his wife's salon. They started chatting, and at one point he complained about the prospect of moving to a small town in Oklahoma for a job. Levine listened, and she had a better idea. She told Larson that she needed an in-house controller for Penny's and he should consider interviewing for the job. It all worked out very well. Larson won the position and began a 50-year professional and personal relationship.

Penny's had just moved its accounting in-house, and Larson became head of its accounting staff, took care of the financial statements, and did the bank reconciliations. After George died in 1974, Larson became more deeply involved with the family's business. When the family sold Penny's, he even stayed on for another year or two to help close the business out.

He also helped Levine as she began exploring other investments. According to Larson, Levine had her eye out for investments that would help the key people that she worked with, all of whom were family— except for Larson himself. Indeed, it was Larson who saw the potential in that first mobile-home park in Dayton, Minnesota. He brought the

idea to Levine, she approved, and the family went off in that new direction.

Larson's role grew with the business, and he has stayed on with 5005 Properties and 5005 Finance, where he is president of both. He oversees the tax and accounting work for the companies, and he signs most of the companies' tax returns. Levine's making him one of her attorneys-in-fact was especially sensible as he was close with every member of the Levine family.[5] Levine drafted these powers of attorney; if there are any disagreements among the three attorneys-in-fact, the decision of the majority takes the day.

Levine's decision to name attorneys-in-fact meant that she contemplated her mortality, but it didn't mean at first that she was any less active. She continued to manage her own legal affairs and stayed involved in the businesses. She was happy to delegate, but always stayed alert as the "watchdog." She would look over financials with Larson monthly and made sure she knew all that was going on with the businesses. Then, in 2003, she suffered a stroke while on vacation in Palm Springs.[6] In 2004 or 2005 Robert and Nancy became concerned about her driving skills. They arranged for her to take a driver's test, and her driver's license was taken away. This was an important event. Levine remained involved in the business, but she worked less and less. She hired someone to drive her to the office but came in only about twice a week. Her health did not improve. It took another step down in 2008, when signs of dementia began to appear, but even as she neared 90, Levine still wanted to know what was going on. Larson began to go to her home with financial statements to review, but more out of habit and to hear echoes of earlier times than to get her advice or seek her approval.

---

[5] Larson described Levine as "my second mom." Nancy claimed that Larson was "as close to [Levine] as any person could have been" and his role as an attorney-in-fact was to protect her. And Robert credibly stated that he and Larson "have been friends forever."

[6] There was sincere but conflicting testimony regarding when and exactly how much Levine's health began to decline. Robert identified the stroke in 2003 as the first sign that his mother was no longer as mentally sharp as she used to be. Larson also thought that her mental activity probably started to decline after the stroke, although at first he didn't notice anything different about her when she returned to work. And Nancy claimed not to notice any real changes until around 2006, after her mother's third husband died.

III.    *Levine's Estate Planning*

Well before any of these health issues arose, Levine began to plan her estate.  She first created a revocable trust—the Marion Levine Trust—in May 1988.  Levine herself was the trustee; she named Larson, Robert, and Nancy as successor trustees; and Nancy, Robert, and their children as beneficiaries.[7]  She first amended this trust agreement in May 1996 to add Larson, Robert, and Nancy as cotrustees.  Then, in February 2005 she resigned as trustee and made Larson, Nancy, and Robert the sole cotrustees at about the same time as she signed the short-form power of attorney that we've already mentioned.  *See* Minn. Stat. § 523.23 (2005).

Between 1996 and 2007 Levine used an attorney named Bill Brody to do her estate planning, and Brody had prepared all of Levine's estate-planning documents.  But as Levine's health grew worse, her family and Larson pressed her to search for a new lawyer to advise them.  Shane Swanson, an attorney at Parsinen Kaplan Rosberg & Gotlieb, P.A. (Parsinen), was referred to the Levine family by Levine's sister, who had been using Swanson and was extremely pleased with his work.  The family and Swanson clicked, and in November 2007 they retained the Parsinen firm to review and revise Levine's estate plan.  Although Howard Rubin, a senior estate-planning partner at Parsinen, negotiated the fee for services and signed the engagement letter on behalf of the firm, Swanson was the primary point of contact for Levine and her attorneys-in-fact, and he took the lead on the estate-planning work.

Swanson first worked with Levine to make sure all her business entities both were properly structured and meshed well with a comprehensive estate plan.  Many of the entities that Levine had invested in—especially the partnerships—were governed by old documents, so Swanson worked to revise them.  While he ran into difficulties when multiple other partners and parties were involved,

---

[7] Levine limited the interests of her grandchildren to a subtrust that would be funded by whatever was left of her generation-skipping-transfer-tax (GSTT) exemption.  (The GSTT prevents taxpayers from avoiding the estate tax by passing their property to grandchildren instead of children.  It includes an exemption that allows taxpayers to exclude a certain amount, and in 2009, this amount was $3.5 million.  *See* § 2010.)  The remaining unused amount of Levine's GSTT exemption that was accounted for in creating the grandchildren's subtrust was a little over $3 million.  (All section references are to the Internal Revenue Code and regulations in effect at the relevant time, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we state otherwise.)

Swanson was able to either update or restructure the partnerships that Levine controlled directly into more modern entities such as LLCs. Swanson also created different trusts to hold some of Levine's real-estate assets which allowed her to pass them to her children in ways that would produce estate-tax savings. He wasn't looking to do anything radical and started by using two tools well known to estate planners: the grantor retained annuity trust (GRAT) and the qualified personal residence trust (QPRT).

A GRAT is a "tax-saving device in which a grantor transfers assets into trust and retains an annuity payable for a specified term." *Estate of Hurford v. Commissioner*, T.C. Memo. 2008-278, 96 T.C.M. (CCH) 422, 425 n.2 (citing Bittker et al., *Federal Estate and Gift Taxation* 80-81 (9th ed. 2005)). When these GRATS are structured according to the Code, the transferor avoids incurring any gift-tax liability. *See Grieve v. Commissioner*, T.C. Memo. 2020-28, at *6 & n.4. If the grantor survives to the end of the specified term, any appreciation in the asset's value over the rate specified in section 7520 passes to the beneficiaries without any gift or estate tax. *Id.* If the grantor does not survive, however, the full value of the asset is included in her gross taxable estate. Treas. Reg. § 20.2036-1(c)(2)(i). This GRAT structure is specifically provided for in the regulations under special valuation rules. *See* Treas. Reg. § 25.2701-1 to -8. Levine placed her Dayton Park project partnership—located in Dayton, Minnesota—into the GRAT with a two-year term, with any appreciation on the asset to pass to Nancy and Robert at the end of this term.

A QPRT allows an individual to transfer her home into a trust, which makes it exempt from estate and gift taxes so long as the transferor uses the home as her personal residence for the specified term. *See* § 2702; Treas. Reg. § 25.2702-5. Levine placed 50% of her Minneapolis condo into a QPRT with a two-year term, and the other 50% in a different QPRT with a three-year term. During these terms, she was able to live in her condo rent free, but after the terms expired, title would pass to Nancy and Robert. If Levine wanted to continue to live in the condo, she would at that point be required to pay fair market rent to them to do so. A QPRT can reduce the value of the property it holds by an amount equal to the value of the right to live in it for the trust's term,

which would also reduce potential estate tax.[8]  *See Estate of Riese v. Commissioner*, T.C. Memo. 2011-60, 101 T.C.M. (CCH) 1269.

Levine's specific estate-planning goals and her diverse assets presented challenges even to estate planners as skilled as the ones the family retained.  From the beginning, Larson and Levine's children made it clear to Swanson that Levine wanted enough money to maintain her lifestyle until her death.  This meant that any estate planning needed to be done with Levine's excess capital—i.e., assets that she would not likely need during her lifetime.  This would be difficult in most circumstances, but especially because so much of Levine's wealth was in real estate or partnerships that owned real estate.  She owned a number of properties that were unencumbered by any debt—her condo in Minneapolis, a home in Rancho Mirage, California, her interests in the mobile-home parks and the two Renaissance fairs, and the Penn Lake Shopping Center.  Levine wanted these assets to stay in her estate so that her children would inherit them with stepped-up bases when they passed to her children.[9]  But, like a halberd, stepped-up basis cuts both ways.  Holding onto real estate might cut future capital-gains tax, but it also meant that its value would be part of Levine's gross taxable estate.  In situations like this, Swanson typically suggested looking to insurance as a way to help clients prepare to pay the estate tax that would eventually be due on these relatively illiquid investments.  Swanson knew that Levine earned more than $1 million annually and that this money would need to be redeployed into other investments.  He also thoughtfully asked about the children's situation and learned that they themselves also had large real-estate holdings and completely lacked any estate plans.  So he suggested to them and Larson that there just might be a way for Levine to invest her excess capital to provide her with a good return, while at the same time meshing with the Levine children's needs for estate plans of their own.

His idea: intergenerational split-dollar life insurance.

---

[8] Since Levine did not survive the full term of either the QPRTs or the GRAT, the gamble did not pay off, and the full values of both the Dayton Park partnership and the Minneapolis condo became includible in her gross estate.

[9] Section 1014 resets basis in property to its fair market value at the time of its owner's death.  This results in a smaller taxable gain realized by the heir if he ever sells the property and the property's value has increased.

### A.    *Planning the Split-Dollar Life-Insurance*

While Swanson had done a split-dollar insurance arrangement before, he had never done a transaction like the one he was proposing for Levine—loans from a parent to her children to buy life insurance for *them*. He explained that the circumstances that might make this type of transaction attractive are very rare, and require that the client

- has enough cash to buy a substantial amount of life insurance, and to live on for the rest of her life;

- faces an estate-tax bill large enough to justify the costs of planning and execution;

- has children whose lives would be insured, and who themselves have a sufficient net worth to qualify for large life-insurance policies; and

- has children who are healthy enough to navigate the underwriting process successfully.

Swanson spent a good deal of time thinking through all the advantages and disadvantages, conditions and qualifiers. He put together a PowerPoint presentation for the family in late 2007 or early 2008. Then in January 2008 he sent a letter to Larson and the children in which he described the transaction and its legal and tax implications.

He told them that Levine could contribute money to a trust that would be for the benefit of Robert, Nancy, and her grandchildren. Its trustees would then use the money to buy life-insurance policies on Nancy and Robert's lives. This would not be purely a gift—the trust would get Levine's money only in exchange for a promise by the trust to pay her the greater of the money she advanced, or the cash value of the policies upon the earlier of the insureds' deaths or the policies' surrender. The right to this repayment would be held by Levine as a "receivable",[10] or in other words an asset that the Estate had to report on its estate-tax return. His proposal assumed that Levine would lend the trust enough to pay $10 million in premiums, but he said that the technique could be used at any premium level depending on the insured's insurability—i.e., "proof of good health of the insured." *See Likly & Rockett Trunk Co. v. Provident Mut. Life Ins. Co.*, 85 F.2d 612,

---

[10] When we refer to the "split-dollar receivable" or "receivable" we are referring to this contract right.

613 (6th Cir. 1936). Swanson's proposal was complex, and we believe the testimony of Levine's children and Larson that, even though they each received a copy of this detailed proposal letter, they actually learned more about the transaction and finally understood it better through Swanson's discussions with them.

Levine, her children, and Larson spoke among themselves about the costs and benefits of the deal. Levine herself approved the transaction, but limited the amount that she was willing to lend to the trust for premiums to $6.5 million. Levine thought that she had done enough for her kids and wanted to make sure that she could take care of her grandchildren.

Swanson set to work.

1.       *Establishing the Irrevocable Life-Insurance Trust*

First he created the trust that would own the split-dollar life-insurance policies—the Marion Levine 2008 Irrevocable Trust (Insurance Trust).[11] Irrevocable life-insurance trusts are typically used as a vehicle to own life-insurance policies to reduce gift and estate taxes. *See Estate of Petter v. Commissioner*, T.C. Memo. 2009-280, 98 T.C.M. (CCH) 534, 535 n.3, *aff'd*, 653 F.3d 1012 (9th Cir. 2011). If done properly, a life-insurance trust can take a policy out of its settlor's estate and allow the proceeds to flow to beneficiaries tax free. *Id.* Levine's Insurance Trust was signed at the end of January 2008 by her children and Larson as attorneys-in-fact and the South Dakota Trust Company, LLC (South Dakota Trust) as an independent trustee. The Insurance Trust's beneficiaries were Robert, Nancy, and Levine's grandchildren—the grandchildren that Levine naturally wanted to take care of.

Swanson settled the Insurance Trust in South Dakota because its laws are favorable—it has no rule against perpetuities, but does have a taxpayer-friendly state income tax and a favorable premium tax. South Dakota is also one of the few states with a "directed" trustee statute, which allows the separation of management and administration of a trust's investments. *See* S.D. Codified Laws ch. 55-1B (1997). Levine's Insurance Trust named South Dakota Trust as its directed trustee. This put South Dakota Trust in charge of administration—opening up trust

---

[11] While Swanson created the Insurance Trust to own the life-insurance policies taken out as part of the split-dollar transaction, we find him credible when he said that he also viewed the Insurance Trust as something Nancy and Robert could use in their own eventual estate planning.

accounts and handling them according to the terms of the trust document. But South Dakota Trust was only the administrator—it had no authority to choose what the trust would invest in.[12] Swanson drafted the trust to have trustees whose job it would be to direct its investments. This was the "investment committee," and its membership consisted of one person—Larson.[13] Levine picked Larson for this role because he had long been very close to the Levine family yet was not a part of it. Levine knew the relationship between her children was fraught. She wanted someone she could trust to manage not just the trust but the relationship—and her children understood this. Larson has been the sole member of the investment committee since it began. South Dakota law defines this committee's fiduciary obligations to the Insurance Trust and its beneficiaries. *See* S.D. Codified Laws § 55-1B-4 (1997). And we specifically find that, as the committee's only member, Larson was under a fiduciary duty to exercise his power to direct the Insurance Trust's investments prudently, and he faced possible liability to its beneficiaries if he breached that duty.

Larson approved the split-dollar life-insurance arrangement on behalf of the Insurance Trust in his role as the investment committee.

## 2. *Acquiring the Life Insurance Policies*

The next step was for the Insurance Trust to buy insurance. Levine, her children, and Larson first had to decide who would be the insured parties. Swanson initially suggested that the life-insurance policies should be taken out on the lives of both Nancy and Robert. But Robert had a preexisting medical condition that would have made him uninsurable at a reasonable price. So Levine, her children, and Larson decided instead that the Insurance Trust would buy policies on the lives of Nancy and her husband Larry. Swanson then worked with an

---

[12] South Dakota Trust could also be directed by the investment committee on how to deal with distributions for the trust, although it maintained discretion on how to do this.

[13] S.D. Codified Laws § 55-1B-9 (2017) states:

A trust instrument governed by the laws of South Dakota may provide for a person to act as an investment trust advisor or a distribution trust advisor, respectively, with regard to investment decisions or discretionary distributions. Unless otherwise provided or restricted by the terms of the governing instrument, any person may simultaneously serve as a trust advisor and a trust protector.

This allows for an investment committee of just one person.

insurance broker to find the right insurance companies. After mulling over Swanson's advice Levine, her children, and Larson settled on two last-to-die policies with John Hancock and Pacific Life. Once the applications for the life-insurance policies were submitted in April 2011, the process of pulling together the cash to fund the policies began.

This had to be given some thought. Even though Levine had a net worth in excess of $25 million in 2008, Swanson and Levine's children decided to borrow money to fund these life-insurance premiums.[14] This was an investment decision made by Levine and her children. They wanted to lock in the quoted premium rates for the policies, so they quickly took out short-term loans to do so. Several of these loans would be taken out by Levine's real-estate partnerships. And, with the exception of the Central Bank loan, they expected to quickly repay the loans and any of Levine's advances by refinancing the debt on the partnerships, as well through the sale of the Arizona Renaissance Festival.

Between June and August 2008, the children and Larson—as Levine's attorneys-in-fact–executed the paperwork to marshal the $6.5 million they needed, almost all through loans:

---

[14] Larson credibly testified that they could have paid all the premiums in cash if they had decided to take that route.

| Source | Amount | Annual interest rate | Term |
|---|---|---|---|
| Central bank loan | $3,800,000 ($3,730,000 used for premiums) | 6.35% | 60 equal monthly payments |
| Private bank line of credit | $2,000,000 | 5.25% | 1 year, single balloon payment |
| Business bank loan | $516,000 ($500,000 used for premiums) | 6.9% | 60 monthly payments, plus one lump-sum payment at end of 5 years |
| Penn Lake Shopping Center's savings account | $270,000 | N/A | N/A |

a.      *Central Bank Loan*

The first loan was $3.8 million from Central Bank to Penn Lake. Levine owned 100% of Penn Lake and had paid off the mortgage on the property years before. This loan had an interest rate of 6.35%, and Penn Lake promised to make 60 equal monthly payments until July 1, 2013. Penn Lake pledged various properties that it owned as collateral.

Levine and her children felt no urgency to repay the principal of this loan. Their plan was instead to pay the interest, which they'd been advised would increase Levine's basis in the receivable that the Estate would be obtaining as part of this split-dollar transaction.[15] Levine's estate would eventually owe tax on what it got back from the Insurance Trust through the receivable the Estate held, and that tax would shrink if Levine's basis in the receivable increased.[16]

---

[15] While interest paid can be deducted from income under section 163, section 264 denies this deduction to the extent that the money is borrowed to fund a life-insurance policy, and in effect defers the deduction until the policy matures.

[16] The family thought that the tax that would eventually be owed by Levine's estate on this receivable would be determined by the difference between the receivable's value at the date of its repayment and its basis. The receivable's basis would be the receivable's reported value on the estate-tax return plus the total deferred interest payments from the Central Bank loan. If it all worked, the arrangement would produce a nice deferral of the tax owed until the Insurance Trust repaid the Estate its receivable.

b.      *Private Bank Line of Credit*

The children and Larson, acting as her attorneys-in-fact, also opened a personal line of credit with Private Bank of Minnesota. This gave Levine access to $2 million for a term of one year at 5.25%. Any outstanding balance was due and payable in a single balloon payment in thirteen months. They secured this line of credit with various properties and assets that Levine Investments, 5005 Properties, and 5005 Finance owned.

c.      *Business Bank Loan*

The last of the three loans was arranged by Nancy and Robert in their capacities as cotrustees of Levine's Revocable Trust. It was with Business Bank for $516,000 at an annual rate of 6.9%, with monthly payments of $4,000 over the course of 5 years, followed by a balloon payment of any unpaid principal and interest at the end of that term. They secured it with the Revocable Trust's interests in several installment-sales contracts and leases.

With the loan proceeds and some cash from Penn Lake's account, Levine's children and Larson—again acting as her attorneys-in-fact—wired $4 million from Penn Lake to the Pacific Life Insurance Company to pay the one-time premium for insurance on the lives of Nancy and Larry. It is a whole-life policy with a face value of $10,750,000 that will pay out after both of their deaths. It also had a cash-surrender value that was guaranteed to increase by at least 3% per year.

A few days later, Private Bank of Minnesota wired $2 million to the John Hancock Life Insurance Company. A month later, Business Bank wired another $500,000. This paid the one-time premium for another last-to-die whole-life policy, this one for $6,496,877. It had a cash-surrender value guaranteed to increase by at least 3% per year.

B.      *Levine's Split Dollar Arrangement*

Between June and July 2008, Nancy, Robert, and Larson—in their capacities as Levine's attorneys-in-fact and as trustees of her Revocable Trust—executed several documents to put the split-dollar arrangement into effect. We summarize the most important parts of the deal:

17

- The Insurance Trust agreed to buy insurance policies on the lives of Nancy and Larry;

- The Revocable Trust agreed to pay the premiums on these policies;

- The Insurance Trust agreed to assign the insurance policies to the Revocable Trust as collateral;

- The Insurance Trust agreed to pay the Revocable Trust the greater of (i) the total amount of the premiums paid for these policies—$6.5 million—and (ii) either (a) the current cash-surrender values of the policies upon the death of the last surviving insured or (b) or the cash-surrender values of the policies on the date that they were terminated, if they were terminated before both insureds died.

It was very important, if this deal was to work, that the Insurance Trust and not the Revocable Trust own the policies. The recitals in the arrangements state that the parties do *not* intend to convey to Levine or the Revocable Trust any "right, power or duty that is an incident in ownership . . . as such is defined under Section[s] 2035 and 2042" in the life-insurance policies at the time of Levine's death. They also state that neither the Insurance Trust, nor its beneficiaries, nor the insureds—Nancy and Larry—would have access to any current or future interest in the cash value of the insurance policies.

We also specifically find that *only* the Insurance Trust—and that means Larson—had the right to terminate the arrangements. There were two split-dollar arrangements, one for each insurance company. Paragraph 6 from both arrangements controlled the right to terminate the arrangements:

The Insurance Trust shall have the sole right to surrender or cancel the Policy during the lifetime of either insured. In addition the Insurance Trust may terminate this Agreement in a writing delivered to the other party, effective upon the date set forth in such writing.

If the Insurance Trust did terminate the Agreement, however, it would get nothing:

The Revocable Trust shall have the unqualified right to receive the total amount payable upon such surrender or

cancellation of this Policy, or upon termination by notice from the Insurance Trust, and the Insurance Trust shall not have access to, or any current or future interest in, the Cash Value. Upon such payment of said funds to, and receipt of said funds by, the Revocable Trust, this Agreement shall terminate.

With the split-dollar deal done, Swanson had finished hammering into place the paper armor he had designed to protect as many of Levine's assets from tax as he legally could. He was just in time; within months, Levine's physical and mental health began to deteriorate more rapidly. She became more forgetful and began to not recognize her family and friends. At the start of 2009, she became bedridden. On January 22 she died.

C. *Tax Reporting*

Everyone involved knew that Levine, through her Revocable Trust, had given away some of her property to the Insurance Trust and its beneficiaries—they knew, in other words, that the value of the money the Revocable Trust would get years later wasn't equal to the $6.5 million it had given to the Insurance Trust for it to buy the insurance policies on Nancy and her husband. They knew that this was a taxable gift. Swanson prepared gift-tax returns for 2008 and 2009. Larson and Nancy signed these returns in their capacities as Levine's attorneys-in-fact. Each Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, reported the value of the gift as the economic benefit transferred from the Revocable Trust to the Insurance Trust. Gifts of valuable property for which the donor receives less valuable property in return are called "bargain sales." *See Estate of Bullard v. Commissioner*, 87 T.C. 261, 265 (1986). And the value of gifts made in bargain sales is usually measured as the difference between the fair market value of what is given and what is received. *Id.* at 270–71. Not so here. The Secretary, for whatever reason, has issued regulations that provide a different measure of value when split-dollar life insurance is involved. *See* Treas. Reg. § 1.61-22(d)(2). The number Larson and Nancy came up with after applying the valuation rules in the regulations was $2,644. *See* Treas. Reg. § 25.2512-1.

Everyone involved also knew that the promise of the Insurance Trust to pay the Revocable Trust some amount sometime in the future was also valuable. It had to be reported on the Levine's estate-tax return. And on Levine's Schedule G, Transfers During Decedent's Life,

of the Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, the value of the split-dollar receivable, as owned by the Revocable Trust on the alternate valuation date, was reported as an asset worth about $2 million.[17]

IV.    *Audit and Trial*

This shift of money from the Revocable Trust for the purchase of the life-insurance policies that benefited the Insurance Trust caught the IRS's attention. The Commissioner issued his challenge, and the joust between the IRS and the Estate began.  The Commissioner noticed two things in particular.  The first was the small amount—only $2,644—that Levine reported as the gift that her Revocable Trust had made to the Insurance Trust.   The second was that the Insurance Trust had promised to pay the Revocable Trust the *greater* of $6.5 million or the policies' cash surrender value at *either* the death of both Nancy and her husband *or* upon termination of the policies.  At the time of Levine's death, this value was close to $6.2 million, and the Commissioner suspected there was no insurmountable hurdle to the Insurance Trust's terminating the policies well before Nancy and her husband both died. This would mean that the Insurance Trust and Levine's descendants, as beneficiaries of the Revocable Trust, had ready access to $6.2 million, not just the $2.1 million + $2,644 that was reported on the estate and gift-tax returns.

The Commissioner assigned as his champion estate-and-gift-tax attorney Scott Ratke.  Ratke conducted an extensive audit, and in the end the Commissioner issued a notice of deficiency to the Estate for slightly more than $3 million.  This reflected several adjustments, but his adjustment to the value of Levine's rights under the split-dollar arrangement was by far the biggest.  He also determined that the Estate was liable for a 40% gross-misvaluation penalty under section 6662(h) because the value that it had reported for the split-dollar receivable was way too low.  Ratke prepared a penalty-approval form for this penalty, which was signed by his immediate supervisor at the time—Nicole Bard—before the notices of deficiency were sent.[18]

---

[17] The parties later stipulated that the fair market value of the split-dollar receivable, if the Estate prevails, is a bit higher—$2,282,195.

[18] The Commissioner also issued a notice of deficiency for Levine's 2008 gift-tax return.  Levine's estate challenged this as well, and we consolidated the cases.  We

Counsel for the parties worked together to narrow the issues so their combat could be confined to a small tilt and not become a general melee. Three stipulations settled most issues. Only two remain:

- Was the value of the split-dollar receivable in Levine's estate on the alternative valuation date $2,282,195, or the policies' cash-surrender value of $6,153,478; and

- Is any resulting underpayment subject to the 40% gross-misvaluation penalty under section 6662(h).[19]

The parties have also stipulated that this case is appealable to the Eighth Circuit. *See* § 7482(b)(2).

*Discussion*

I.    *Split Dollar Life Insurance*

Split-dollar life-insurance deals began as a form of employment compensation. Employers wanted to pay the premiums on life insurance for their employees, keep an interest in the insurance policy's cash value and death proceeds, and pass on to the employee—or the employee's designated beneficiary—any remaining death benefit. *See De Los Santos v. Commissioner*, T.C. Memo. 2018-155, 116 T.C.M. (CCH) 304, 306. (The "split" in "split-dollar" refers to this division of the insurance proceeds between the insured and the person or entity that paid the premium.) In 1964, the IRS issued Revenue Ruling 64-328, 1964-2 C.B. 11, *revoking* Rev. Rul. 55-713, 1955-2 C.B. 23, in which it announced that it would include the death-benefit portion of a life-insurance policy in a recipient's income because it was an economic benefit. Tax planners and professionals began to devise different variations of these sorts of

---

then issued our opinion in *Estate of Morrissette v. Commissioner* (*Morrissette I*), 146 T.C. 171 (2016). Both the Estate and the Commissioner agreed that *Morrissette I* required us to enter judgment against the Commissioner in the gift-tax case. We then severed the cases. The decision in the gift-tax case—that there was no deficiency despite the remarkably low value of the gift—has long since become final and unappealable.

[19] There was one additional issue that the parties did not settle—whether the Estate was entitled to a $1 million charitable contribution to the George and Marion Levine Foundation. That contribution has not yet been made, but the parties stipulated that this deduction will be allowable once the Estate provides proof of payment. The Estate intends to make this charitable contribution once we enter a decision.

plans, and split-dollar arrangements eventually moved beyond the employment field.

They became a tool for estate planners who aimed to remove death benefits from their clients' taxable estates—or at least defer payment of any tax owed. What makes this attractive are some unusual advantages that the Code gives to buyers of life insurance—especially on what is called "inside buildup." An insurance company can sell a policy with premiums much larger than one would pay for term insurance. This money can go to work for the policyholder or her beneficiaries and "build up" as long as the policy remains in effect. It can make for a much larger death benefit or a substantial cash surrender value. Details quickly become very complicated, but it suffices here to characterize these policies as a form of tax-advantaged savings. Unlike income earned on other savings accounts–such as bank CDs or mutual funds—inside buildup is not taxed under section 72(e) as it accrues. It *is* eventually taxed when it is distributed to the policy holders, *id.*, but that can be a long time into the future, and all other things being equal, tax tomorrow is better than tax today. And tax decades from now is better still.

Over the years, the IRS provided limited guidance on the taxation of split-dollar life-insurance arrangements, mostly in the form of notices and revenue rulings.[20] That all changed when the Treasury Department issued final regulations in 2003. These govern all split-dollar arrangements entered into or materially modified after September 17, 2003. Treas. Reg. § 1.61-22. The final regulations broadly define a split-dollar life-insurance arrangement between an owner and a nonowner of a life-insurance contract in which:

- either party to the arrangement pays, directly or indirectly, all or a portion of the premiums;

- the party making the premium payments is entitled to recover all or a portion of those premium payments, and repayment is to be made from or secured by the insurance proceeds; and

---

[20] William L. Raby & Burgess J.W. Raby, *The Split-Dollar life Insurance Regimes*, 94 Tax Notes 353 (2002); Sherwin P. Simmons, *Economic Benefit Under A Split Dollar Arrangement*, 1 Tax Prac. & Controv. 550 (Mar. 21, 1994).

- the arrangement is not part of a group-term life insurance plan (other than one providing permanent benefits).

*Id.* para. (b)(1)

The split-dollar arrangement in this case meets these specific requirements. After defining what a split-dollar arrangement is, the final regulations create two different and mutually exclusive regulatory regimes—called the "economic benefit regime" and the "loan regime"—that govern the income- and gift-tax consequences of split-dollar arrangements. Which regime a particular arrangement falls under depends on who "owns" the life-insurance policy at issue. *Id.* subpara. (3)(i). The general rule is that the person named as the owner is the owner. *Id.* para. (c)(1). Nonowners are any person other than the owner who has a direct or indirect interest in the contract. *Id.* subpara. (2). Under this general rule, the Insurance Trust would be the owner of the policies here, and the loan-regime rules would apply.

But there is an exception to this general rule. If the only right or economic benefit provided to the donee under a split-dollar life-insurance arrangement is an interest in current life-insurance protection, then the regulations tell us to ignore the formal ownership designation and treat the donor as the owner of the contract. This is the economic-benefit regime. *Id.* subpara. (1)(ii)(A)(2). So there's at least a threshold question here about whether the Insurance Trust received any economic benefit in addition to current life-insurance protection.

On this we have precedent. In *Morrissette I*, we held that a split-dollar arrangement much like this one fell under the economic-benefit regime for gift-tax purposes. But we also noted in *Morrissette I*, 146 T.C. at 172 n.2, that "we [were] not deciding whether the estate's valuation of the receivables . . . in the gross estate [was] correct." And section 1.61-22(a)(1) seems not to cover the estate-tax consequences of split-dollar arrangements at all.[21] The final regulations do make one reference to estate tax in their preamble, which states "[f]or estate tax

---

[21] Treasury Regulation § 1.61-22(a)(1) states:

This section provides rules for the taxation of a split-dollar life insurance arrangement for purposes of the *income* tax, the *gift* tax, the Federal Insurance Contributions Act (FICA), the Federal Unemployment Tax Act (FUTA), the Railroad Retirement Tax Act (RRTA), and the Self-Employment Contributions Act of 1954 (SECA).

(Emphasis added.)

purposes, regardless of who is treated as the owner of a life insurance contract under the final regulations, the inclusion of the policy proceeds in a decedent's gross estate will continue to be determined under section 2042." T.D. 9092, § 5, 2003-2 C.B. 1055, 1063. But the express terms of section 2042 limit its applicability to life-insurance policies on a decedent's own life, not split-dollar arrangements where policies are taken out on the lives of others. *See* § 2042(1); Treas. Reg. § 20.2042-1(a)(2) ("[S]ection 2042 has no application to the inclusion in the gross estate of the value of rights in an insurance policy on the life of a person other than the decedent"). From this we conclude that neither the regulation nor section 2042 governs our valuation of the split-dollar arrangement we have to analyze.

II.    *Estate Tax Generally*

That leaves us to look to the default rules of the Code's estate-tax provisions to figure out how to account for the effect of *this* split-dollar arrangement on the gross value of *this* estate. The Code defines a taxable estate as the value of a decedent's gross estate minus applicable deductions. § 2051. A decedent's gross estate includes the value of any property that a decedent had an interest in at the time of her death. § 2033. Some taxpayers reduce their estate-tax liability by making *inter vivos* transfers several years before death[22] and pay a usually smaller tax on the transfer.[23] § 2501(a). Sections 2034 through 2045 tell us what other property to include in an estate.

Among these sections is section 2036, which generally includes in a decedent's taxable estate the value of property that she transfers if, after the transfer, she kept either possession or the right to income from the property; or even if she kept a right—either alone or in conjunction with another—to designate who would receive possession of that property or its income. Section 2038 generally claws back into a decedent's estate the value of property that she transferred in which she retained an interest or right—either alone or in conjunction with another—to alter, amend, revoke, or terminate the transferee's enjoyment of the transferred property. Both sections 2036 and 2038

---

[22] To reduce her estate-tax liability, a decedent must give property away more than three years before her death. If she doesn't, any tax paid on the gift must be added to her estate. § 2035(b).

[23] Usually, but not always. Federal gift-and-estate-tax law allows a credit that reduces the tax on gifts made while the donor is alive; and if it's not used up, it can reduce the estate tax. § 2505(a).

include an exception for transfers that are "a bona fide sale for an adequate and full consideration in money or money's worth." §§ 2036(a), 2038(a)(1).

Section 2703 also tells us how to value property for gift, estate, and generation-skipping-transfer tax purposes. It states that under certain circumstances property must be valued without regard to any right or restriction relating to the property that would result in the property's being valued at less than its fair market value. *See* § 2703(a).

The Estate asserts that the only asset from the split-dollar arrangement that Levine's Revocable Trust owned at the time of her death was the split-dollar receivable. In its view, Levine did not own, or have any other interest in, the life-insurance policies because those policies were owned by the Insurance Trust. And, as the Estate also points out, the value of that receivable is a number that the parties have stipulated. *See supra* note 17.

In the Commissioner's view, this entire transaction was merely a scheme to reduce Levine's potential estate-tax liability and, if it was a sale, it was not *bona fide* because it lacked any legitimate business purpose. He argues that the Estate should have reported on its return the cash-surrender values of the life-insurance policies, not the value of the receivable. He reasons that:

- under section 2036 Levine retained the right to income— or the right to designate who would possess the income— from the split-dollar arrangement, and

- under section 2038 she maintained the power to alter, amend, revoke, or terminate the enjoyment of aspects of the split-dollar arrangement,

- even if the full values of the life-insurance policies are not includible in Levine's estate under section 2036 or 2038, the restrictions in the split-dollar arrangement should be disregarded under the special valuation rules provided in section 2703, which would force the Estate to include in its taxable value the full cash-surrender values of the policies.

III.    *Sections 2036 and 2038: What Rights Were Transferred and Retained*

We look first at what rights the Estate, through the Revocable Trust, transferred and what rights it retained.  We agree with the Commissioner that the two snippets of the Code that we have to decrypt here are sections 2036 and 2038.

Section 2036(a) is a catchall designed to prevent a taxpayer from avoiding estate tax simply by transferring assets before she dies.  *Strangi v. Commissioner*, 417 F.3d 468, 476 (5th Cir. 2005), *aff'g Estate of Strangi v. Commissioner*, T.C. Memo. 2003-145, 85 T.C.M. (CCH) 1331; *Estate of Bigelow v. Commissioner*, 503 F.3d 955, 963 (9th Cir. 2007), *aff'g* T.C.M. (RIA) 2005-065; *Estate of Thompson v. Commissioner*, 382 F.3d 367, 375 (3d Cir. 2004), *aff'g* 84 T.C.M. (CCH) 374 (2002).  It states:

> Sec. 2036(a).  General rule.—The value of the gross estate shall include the value of all *property* to the extent of any interest therein of which the decedent has at any time *made a transfer* (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
>
> > (1) the possession or enjoyment of, or the right to the income from, the *property*, or
> >
> > (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the *property or the income* therefrom.

(Emphasis added.)  Section 2038 also speaks of transferred "property", and includes in the gross value of an estate all property

> [t]o the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever

capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3 year period ending on the date of the decedent's death.

(Emphases added.)

The Estate argues that:

- it made no transfer of its property that could trigger these sections,

- it retained no interest in the property that it did transfer, and in any event,

- the *bona fide* sale for adequate and full consideration exemption applies.

We will take these arguments in order.

A.    *What Was "Transferred"?*

Cases tell us to define "transfer" broadly. *Estate of Bongard v. Commissioner*, 124 T.C. 95, 113 (2005); *Estate of Jorgensen v. Commissioner*, T.C. Memo. 2009-66, 97 T.C.M. (CCH) 1328, 1333, *aff'd,* 431 F. App'x 544 (9th Cir. 2011). "A section 2036(a) transfer includes any inter vivos voluntary act of transferring property." *Estate of Jorgensen*, 97 T.C.M. (CCH) at 1333 (citing *Estate of Bongard*, 124 T.C. at 113). Section 2038's scope likewise imposes "a broad scheme." *Estate of Morrissette v. Commissioner* (*Morrissette II*), T.C. Memo. 2021-60, at *66, 121 T.C.M. (CCH) 1447 (quoting *Guynn v. United States*, 437 F.2d 1148, 1150 (4th Cir. 1971)).

But what property? Here the parties disagree. Is the property we look at the policies themselves? Is it the rights under the split-dollar arrangement to receive the greater of $6.5 million or the cash-surrender values of those policies? Or is it simply the $6.5 million in cash wired to the Insurance Trust from Levine's assets before she died?

We find that the "property" at issue cannot be the life-insurance policies, as these policies have always been owned by the Insurance Trust. The split-dollar transaction was structured so that the $6.5

million was paid by the Revocable Trust in exchange for the split-dollar receivable. It was the Insurance Trust that bought the policies and held them. These policies were never owned by the Revocable Trust, and there was no "transfer" of these policies from the Revocable Trust to the Insurance Trust.

The "property" is also not the receivable itself. That property belonged to the Revocable Trust and now it belongs to the Estate. It wasn't "transferred"; it was retained.

That leaves the $6.5 million that Levine sent to the Insurance Trust from her assets that the Insurance Trust used to pay for the insurance policies. And we do find that through her attorneys-in-fact Levine made a voluntary *inter vivos* transfer within the meaning of sections 2036(a) and 2038 when she wired $6.5 million to the life-insurance companies.

From the Commissioner's perspective, this is much too abbreviated an analysis. Don't look at the money or the policies or the receivable, he argues. Look for that right to unlock the cash-surrender values of those policies. To be sure, those values may be defined by the terms of the life-insurance policies and thus defined by an arrangement between the Insurance Trust and the insurance companies in property that the Estate did not itself *transfer*; but does the right of the Revocable Trust (and now the Estate) under the split-dollar arrangement to receive those cash-surrender values not somehow make them includible in the Estate's gross value?

Perhaps it might make sense, were this our first pass at the target, to more simply analyze the problem. We might just ask whether an estate that holds a split-dollar receivable has a right to a policy's cash surrender value in its gross value directly—to ask first whether an estate has such a right and, if so, what its value is as of the date of death.[24] But our approach as it has evolved instead elides the questions of whether this right was retained when the property creating it was transferred and whether it might somehow be exercised by the estate.

B. *Were Rights Retained?*

Section 2036's regulations tell us that "[a]n interest or right is treated as having been retained or reserved if at the time of the transfer

---

[24] Remember that an estate's gross value is "the value at the time of . . . death of all property, real or personal, tangible or intangible, wherever situated." § 2031(a).

there was an understanding, express or implied, that the interest or right would later be conferred." Treas. Reg. § 20.2036-1(c)(1)(i). The use, possession, enjoyment, right to income, or other enjoyment of property is considered having been retained or reserved "to the extent that the use, possession, right to the income, or other enjoyment is to be applied towards the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit." *Id.* para. (b)(2).

If we are right that the only property that Levine transferred was cash, then our analysis under section 2036 would seem to be easy—she retained no "interest" in that *cash*. But she did get something in return—the split-dollar receivable created and defined by the split-dollar arrangements. The receivable gave her the right to the greater of $6.5 million or the cash-surrender values of the policies. Under the terms of the split-dollar arrangements, however, Levine did not have an immediate right to this cash-surrender value. She (or her estate) had to wait until the deaths of both Nancy and Larry, or the termination of the policies according to their terms. Here we find what could be a very important difference between the split-dollar arrangements here and those analyzed in *Estate of Cahill* and *Morrissette II*. In Levine's case, the split-dollar arrangements between the Revocable Trust and the Insurance Trust expressly stated that *only* the Insurance Trust had the right to terminate the arrangement.

The split-dollar arrangements we analyzed in *Morrissette II* and *Estate of Cahill* were different. Look at the language in those arrangements. In *Morrissette II*:

> The Donor and the Trust may *mutually* agree to terminate this agreement by providing written notice to the Insurer, but in no event shall either the Donor or the Trust possess the unilateral right to terminate this Agreement.

And in *Estate of Cahill*:

> This Agreement may be terminated during the Insured's lifetime *only* by written agreement of the Donor *and* the Donee acting unanimously. Such termination shall be effective as of the date set forth in such termination agreement.

This difference matters. Unlike what we saw in *Morrissette II* and *Estate of Cahill*, we see here a carefully drafted arrangement that expressly gives the power to terminate *only* to the Insurance Trust. It

gave Levine herself no unilateral power to terminate the policies and no language like that in the arrangement at issue in *Estate of Cahill* or *Morrissette II* that gave her that right acting in conjunction with the Insurance Trust. *See supra* pp. 16–17. By requiring *both* parties' approval, the arrangements that we analyzed in *Morrissette II* and *Estate of Cahill* necessarily *required* each decedent's approval to terminate the arrangement. The opposite is true here, where only the Insurance Trust could terminate the arrangement. Without any contractual right to terminate the policies, we can't say that Levine had any sort of possession or rights to their cash-surrender values. If the contest between the Estate and the Commissioner were confined to the tiltyard defined by the transactional documents, we would have to conclude that sections 2036(a) and 2038 do not tell us to include the polices' cash surrender values in the Estate's gross value.

The Commissioner, however, tries to unhorse the Estate's argument with the pointed assertion that we should look at the transaction as a whole to get a clear picture of where each party stands and its role in the transaction. And that is exactly what we will do. We'll do it in two ways. We will question whether our review of the rights that any decedent might keep in a split-dollar arrangement really should be defined by the documents alone. Then we will look carefully to the particular circumstances of this transaction to see whether, as a practical matter on the facts of this case, Levine kept a right to the cash-surrender values of the policies bought by the Insurance Trust.

First to the law—should it make a difference whether the transactional documents in a split-dollar arrangement put the unilateral right to unwind the transaction onto the donee rather than split it between the donor and donee? First-year law students almost all learn that a black-letter rule of contract law is that the parties to a contract are free to modify it. *See* Joseph M. Perillo, Contracts (7th ed. 2014). The Commissioner would surely have a strong argument that this implicit power of parties to a contract is a "right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom." § 2036(a)(2).

The Commissioner's first pass at the Estate in this part of their joust would thus be something like this: The Estate is a party to the split-dollar arrangement with the Insurance Trust. The insurance policies belong to the Insurance Trust. But the policies' cash-surrender values are a form of income from that property. The right to the cash-surrender values belongs to the Revocable Trust (and thus the Estate)

if the split-dollar arrangements are terminated. The arrangement may say that only the Insurance Trust has the power to terminate the deal and hand over that income to the Estate, but general principles of contract law allow the Estate to modify any term of the arrangements in conjunction with the Insurance Trust.

The language of section 2036(a)(2) *is* broad—it uses the word "right" without a modifier like "contract" or "instrument creating the." So why shouldn't we construe that word to include background rights like the right to modify a contract? And, if so, wouldn't the cash-surrender values of the insurance policies be either a "right to the income" from that property, § 2036(a)(1), or a right that could be exercised in "conjunction with" another to the income from that property, §§ 2036(a)(2), 2038(a)(1)?

The problem for the Commissioner is *Helvering v. Helmholz*, 296 U.S. 93 (1935), a case about revocable transfers. Helmholz was a widower, whose wife had named him her sole heir. *Id.* at 96. While she was alive, she settled valuable stock in a privately held corporation into a trust. *Id.* at 94. Her brothers and sisters and her parents were the other shareholders, and the trust corpus was destined for later descendants or, if her family line died out, to charity. *Id.*

But her will left everything she owned at death to her husband. *Id.* at 96. The Commissioner argued that settlors of a trust may, with the consent of its beneficiaries, terminate the trust and restore the contributed property to the settlors. *Id.* at 97. Is this not, the Commissioner argued (and here the quote is from the slightly different language of the Code's equivalent of section 2038 back then) "a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke" a transfer of property? *Id.* at 96.

A persnickety textualist might quickly respond that it was. But the Supreme Court looked at the text of the trust agreement itself. That language had express provisions for the trust's termination—the death of the last surviving grandchild in the family, the written agreement of all the beneficiaries, a resolution by the directors of the family's corporation, or the corporation's liquidation. *Id.* at 97. The Court characterized these express provisions for the termination of the trust as typical of "every welldrawn instrument." *Id.* at 96. The Court acknowledged that it was true that "a writing might have been executed by Mrs. Helmholz and her cobeneficiaries while she was alive, with the

effect of revesting in her the shares which she had delivered into the trust." *Id.* at 97. But it held that

> [t]his argument overlooks the essential difference between a power to revoke, alter or amend, and a *condition* which the law imposes. The general rule is that all parties in interest may terminate the trust. The clause in question added nothing to the rights which the law conferred. Congress cannot tax as a transfer intended to take effect in possession or enjoyment at the death of the settlor a trust created in a state whose law permits all the beneficiaries to terminate the trust.

*Id.* (emphasis added) (footnote omitted).

A more recent case that addresses the same problem is *Estate of Tully v. United States*, 528 F.2d 1401 (Ct. Cl. 1976). Tully owned half the stock in a private corporation. *Id.* at 1402. He and his partner reached an agreement long before his death that their company would pay a large death benefit to each of their widows. *Id.* Tully died, and the government argued that the death benefit owed his widow from the corporation had to be included in his estate. *Id.* There was nothing in the instrument that created the benefit that gave Tully himself any interest in it at the date of death, but the government noted that he continued to own half his company till the day he died. *Id.* at 1403. It reasoned that this meant that he had the power, acting with his partner, to do anything he wanted with corporate assets, and maybe he could have persuaded his partner to change the death benefit at any time. *Id.*

Nice try, held the Court of Claims. A power to "alter, amend, revoke or terminate" would trigger inclusion in an estate, but that kind of power "does not extend to *powers of persuasion*." *Id.* at 1404. To be included within the Code's sweep, a power has to be in the instrument itself, not a speculative possibility allowed by general principles of law. A broader reading—that a power to amend an instrument in conjunction with others includes all speculative possibilities—"would sweep all employee death benefit plans into the gross estates of employees." *Id.* at 1405.

We encountered a somewhat similar argument in conservation-easement cases. Congress enacted a Code section to allow a deduction for such easements if done properly. One requirement of a proper easement is that it preserve land in perpetuity. But remember that the

parties to a contract can modify its terms, and easements are a kind of contract. We rejected the Commissioner's argument that a power to amend means that the parties *might* amend it so as to destroy perpetuity, which means that the easement wasn't perpetual. We disagreed: "Generally speaking, the parties to a contract are free to amend it, whether or not they explicitly reserve the right to do so. . . . Respondent's argument would apparently prevent the donor of any easement from qualifying for a charitable contribution deduction under section 170(h) if the easement permitted amendments." *Pine Mountain Pres. LLLP v. Commissioner*, 151 T.C. 247, 282 (2018), *rev'd in part, aff'd in part, vacated and remanded*, 978 F.3d 1200 (11th Cir. 2020).

We therefore agree with *Helmholz* and *Estate of Tully* that general default rules of contract—rules that might theoretically allow modification of just about any contract in ways that would benefit the IRS—are not what's meant in phrases like section 2036's "right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom," or section 2038's "power . . . by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power)." What's meant are rights or powers created by specific instruments. A more extensive reading, as the old Court of Claims noted in *Estate of Tully*, would swing a broadax to fell large swaths of estate and retirement planning that Congress meant to allow to stand.

We therefore conclude that the Commissioner doesn't win as a matter of law here.

But we do think he's correct that we also must avoid being so blinded by any formal gleam from the Estate's armor that we overlook some practical chinks that deals like this may have: Can the Commissioner dismount from purely legal or theoretical arguments and start wielding shorter, sharper weapons forged from the particular facts of particular cases?

The Commissioner thinks he can, and would have us focus on our holdings in *Estate of Strangi*, 85 T.C.M. (CCH) 1331, and *Estate of Powell v. Commissioner*, 148 T.C. 392 (2017), cases in which we concluded that section 2036(a)(2) clawed value back into a decedent's taxable estate despite the drafting skills of talented estate lawyers. In both *Estate of Strangi* and *Estate of Powell* we distinguished the

Supreme Court's opinion in *United States v. Byrum*, 408 U.S. 125 (1972), in which an estate won, so we can begin by summarizing that case.

In *Byrum*, the Supreme Court held that a decedent's right to vote shares of stock in three corporations that he had transferred to a trust for the benefit of his children did not cause those shares to be included in his estate under section 2036(a)(2). The Court noted that any powers the decedent might have had were subject to a number of different "economic and legal constraints" that prevented those powers from being equivalent to the right to designate a person to enjoy trust income. *Id.* at 144. One of these constraints was that the decedent, as the controlling shareholder of each corporation whose stock was transferred into the trust, owed fiduciary duties to minority shareholders that limited his influence over the corporations' dividend policies. *Id.* at 142–43. The Supreme Court also noted that an independent corporate trustee alone had the right under the trust agreement to pay out or withhold income, *id.* at 137, so the decedent had no way of compelling the trustee to pay out or accumulate that income, *id.* at 144. That the decedent had fiduciary duties to these minority shareholders— duties that were legally enforceable—was important to the Supreme Court's analysis. *Id.* at 141–42.

We have been careful to distinguish *Byrum* in later cases when we see something behind a transaction's facade that suggests appearance doesn't match reality. *Estate of Strangi*, 85 T.C.M. (CCH) at 1333–34, featured a decedent who could act with others to dissolve a family limited partnership to which he had transferred property in exchange for a 99% limited-partner interest. The decedent in *Estate of Strangi*—through his son-in-law—also had the right to determine the amount and timing of partnership distributions. *Id.* at 1337. This led us to distinguish *Byrum*, because in *Byrum* the son-in-law had fiduciary duties to other members of the family limited partnership; in *Estate of Strangi*, the son-in-law's potential fiduciary duties—as the decedent's attorney-in-fact and 99% owner of the family limited partnership—were duties he owed "essentially to himself." *Id.* at 1343.

We decided *Estate of Powell* on essentially the same grounds as *Estate of Strangi*. In *Estate of Powell*, 148 T.C. at 394–95, a fiduciary also owed duties to the decedent both as his attorney-in-fact and as partner in a family limited partnership. We found that there was nothing in the record of that case to suggest that as a fiduciary he "would have exercised his responsibility as a general partner of [the family limited partnership] in ways that would have prejudiced decedent's

interests." *Id.* at 404. And we again determined that whatever duties were owed were duties that "he owed almost exclusively to decedent herself." *Id.*

Here's where the Commissioner makes his thrust. He contends that Levine—through her attorneys-in-fact—stood on both sides of these transactions and therefore could unwind the split-dollar transactions at will. This meant that she—again through the attorneys-in-fact—had the power to surrender the policies at any time for their cash-surrender values. (Remember that, under the terms of the split-dollar arrangements, if the Insurance Trust surrendered the policies before the deaths of both Nancy and her husband, it would immediately owe the Revocable Trust the full cash-surrender values of the policies.) The Commissioner argues that these powers constitute the right to possession and enjoyment of, or the right to income from, the split-dollar receivable under section 2036(a)(1). If he's right, we would have to value the receivable at the policies' cash-surrender values.

We agree that Robert, Nancy, and Larson—as Levine's attorneys-in-fact—stood in the shoes of Levine for this split-dollar arrangement. That is the point of giving someone a power of attorney. The Revocable Trust is the entity that paid the $6.5 million, and its cotrustees are Nancy, Larry, and Larson. The Insurance Trust, however, owns the life-insurance policies, and its trustee is South Dakota Trust. South Dakota Trust is directed by the investment committee, and the investment committee's only member is Larson. This, however, means that the only person that stood on both sides of the transaction is Larson—in his role as the investment committee and as one of Levine's attorneys-in-fact.

We therefore must look at each of Larson's roles in this transaction to consider how to apply sections 2036(a) and 2038. Under the 1996 power of attorney and Minnesota law, all actions taken by Larson as an attorney-in-fact are considered to be actions of Levine. *See* Minn. Stat. § 523.12 (2008).[25] The Insurance Trust's instrument, however, states that the Insurance Trust is irrevocable. We have no reason to doubt that this means what it says. And the consequence is that Levine irrevocably surrendered her interest in the Insurance Trust and had no right to change, modify, amend, or revoke its terms. Once it

_____

[25] The Minnesota statute states: "Any action taken by the attorney-in-fact pursuant to the power-of-attorney binds the principal, the principal's heirs and assigns, and the representative of the estate of the principal *in the same manner as though the action was taken by the principal . . . .*" (Emphasis added.)

was created, Levine had no legal power over its assets.  Levine did not have the power to surrender the policies by herself.  Since Larson—in his role as an attorney-in-fact—could not take any action which Levine could not take herself, we find that he could not surrender the policies in his capacity as attorney-in-fact.  This means that even if we treat the Insurance Trust, the policies, or *that* Trust's rights under the split-dollar deal as the "property transferred" (and thus the property whose value we look for) under section 2036, Levine did not retain any right to possession or enjoyment of the property transferred.

To get around these problems, the Commissioner has to argue that Larson has the right to designate who shall possess or enjoy the cash-surrender value of the policies, either by surrendering them or by terminating the entire arrangement.  *See Estate of Cahill*, 115 T.C.M. (CCH) at 1467.  For example, in *Estate of Cahill*, we found that section 2036(a)(2) applied when the decedent jointly held the right to terminate the split-dollar life-insurance policy with the irrevocable trust that held the policies.  *Id.*  We think that's the only way the Commissioner can include the combined cash-surrender values of the life-insurance policies in Levine's estate under section 2036(a)(2) or section 2038.

But we also think that this argument fails to consider the fiduciary obligations Larson owes to the beneficiaries of the Insurance Trust—obligations that would prevent him from surrendering the policies.  The Commissioner first questions the validity and existence of these duties.  He notes that "Larson was not compensated for his role as the sole member of the Investment Committee despite the fact that petitioner has taken the position that he assumed significant fiduciary responsibilities under this role."  But we don't think that matters.  There is no requirement under either South Dakota law[26] or general trust

---

[26] S.D. Codified Laws § 55-1B-4 (2008) provides:

> If one or more trust advisors are given authority by terms of the governing instrument to direct, consent to, or disapprove a fiduciary's investment decisions, or proposed investment decisions, *such trust advisors shall be considered to be fiduciaries when exercising such authority unless the governing instrument provides otherwise.*"

(Emphasis added).

And S.D. Codified Laws § 55-2-1 (2008) provides that "[i]n all matters connected with his trust a trustee is bound to act in the highest good faith toward his beneficiary . . . ."

law[27] that a trustee or trust adviser be compensated to have fiduciary obligations. The terms of the Insurance Trust expressly state that Larson—in his role as the single-member investment committee—shall be considered to be acting in a fiduciary capacity. Therefore we do find that Larson was under fiduciary obligations in his role as the sole member of the investment committee.

Larson's duties in his role for the Insurance Trust required him, however, to look out for the interests of *that* Trust's beneficiaries. And here is where the Commissioner makes a different and subtler argument. He contends that, since Nancy and Robert are beneficiaries of the Insurance Trust, they stand to benefit under the split-dollar arrangement regardless of whether the life-insurance policies remain in place or are surrendered during their lifetime. This means, he says, that Larson would not violate his fiduciary duties to the beneficiaries of the Insurance Trust if he either surrendered, or didn't surrender, the policies because Nancy and Robert would benefit no matter what. If Larson immediately terminated the split-dollar arrangement, surrendered the policies, and sent the money out of the Insurance Trust to the Estate and then to Levine's children, he'd just be benefiting the children in a different capacity.

To this subtle thrust, the Estate has a blunt parry: Levine's children are not the only beneficiaries under the Insurance Trust. Her grandchildren are also beneficiaries, and Larson has fiduciary obligations to them as well. According to the terms of the Insurance Trust, Levine's grandchildren would receive nothing if the life-insurance policies were surrendered. Left unmentioned is the final step in this argument—that Larson has no right to violate his fiduciary obligations by looting the Insurance Trust for the benefit of only some of its beneficiaries.

The Commissioner counters by arguing that the Insurance Trust itself allows Nancy and Robert to extinguish their children's interests in it. This means, he says, that Nancy and Robert are the only real beneficiaries, and stand to benefit regardless of whether the life-insurance policies stay in effect.

---

[27] Restatement (Third) of Trusts § 70, cmt. d(1) (Am. L. Inst. 2007) states that "[w]hether or not a person receives compensation for serving as trustee, the person is subject to a duty to administer the trust in accordance with its terms . . . with prudence . . . and in good faith and conformity with other fiduciary duties referred to in Clause (b)."

37

This misinterprets the way that "extinguishment" works under the provisions of the Insurance Trust, however. The Trust plainly states that "the special testamentary power of appointment hereby granted to said Beneficiary shall not be exercisable in favor of or for the benefit of the Beneficiary . . ."—i.e. they can't extinguish another beneficiary's interest in favor of themselves. The Insurance Trust also states that extinguishment of a beneficiary's interest can occur only by will and cannot take place until the death of the beneficiary doing the extinguishing (which in this case would be Nancy or Robert). So if Nancy and Larry hoped to extinguish the interests of their own children, they couldn't do so until they themselves directly named some other beneficiary to take their place. This means that during the lives of Nancy and Robert, their children will remain beneficiaries of the Insurance Trust, and a decision by Larson to surrender the policies would mean the grandchildren would receive nothing. This would breach his fiduciary duties to them.

Levine's case is thus distinguishable from *Estate of Strangi* and *Estate of Powell*. Many of the same "economic and legal constraints" that existed in *Byrum* exist here. First, the fiduciary obligations that Larson owed were not duties that he "essentially owed to himself." His fiduciary obligations are owed to all the beneficiaries of the Insurance Trust, which include not just Levine's children, but her grandchildren. As we've already discussed, if Larson surrendered the life-insurance policies, those grandchildren would receive nothing as beneficiaries. That makes these fiduciary obligations more analogous to the duties owed to the minority shareholders in *Byrum*, which like them are duties that do limit the powers of the person who holds them. They are also legally enforceable duties, established by South Dakota state law, *see, e.g.*, S.D. Codified Laws §§ 55-2-1, 55-1B-4 (2008), and if Larson breached these duties or was put in a position where he was forced to do so, he would be required under S.D. Codified Law § 55-2-6 (2008) to inform all of the beneficiaries of the Insurance Trust, and he could be removed. He could also be subject to liability under South Dakota law for breach of his duty. *See, e.g., Matter of Heupel Fam. Revocable Tr.*, 914 N.W.2d 571 (S.D. 2018) (trustee breaching fiduciary duties removed and required to personally reimburse trust).

We stress that the fiduciary duties that Larson owed to the beneficiaries of the Insurance Trust do not conflict with the fiduciary duties that he owed Levine as one of her attorneys-in-fact. In both *Estate of Strangi* and *Estate of Powell* we held that the fiduciary's role as the attorney-in-fact would potentially require him to go against his

duties as a trustee. *Estate of Strangi*, 85 T.C.M. (CCH) at 1343; *Estate of Powell*, 148 T.C. at 404. This is not the case here: Under Minnesota law, whenever Larson and the other attorneys-in-fact exercise their powers, they are to do so "in the same manner as an ordinarily prudent person of discretion and intelligence would exercise in the management of the person's own affairs and shall have the interests of the principal utmost in mind." Minn. Stat. § 523.21 (1992). And Larson, Nancy, and Robert all credibly testified that one of the reasons for this split-dollar arrangement was that Levine wished to provide for her grandchildren and keep this arrangement in effect until the insureds died. So not only did Larson's role as an attorney-in-fact not require him to go against his duties as a trustee, the two roles reinforced each other and pushed him to fulfill Levine's stated purpose in her estate planning. They made it more likely that he would not want to cancel the life-insurance policies.

We therefore find it more likely than not that the fiduciary duties that limit Larson's ability to cancel the life-insurance policies were not "illusory". It also persuades us that we cannot characterize his ability to unload the policies and realize their cash-surrender values as a right retained by Levine, either alone or in conjunction with Larson, to designate who shall possess or enjoy the property transferred or the income from it.

We conclude that this precludes the inclusion of the cash-surrender values of the life-insurance policies in Levine's estate under section 2036(a)(2).[28]

Section 2038 focuses on a decedent's power to "alter, amend, revoke, or terminate" the enjoyment of the property in question. The Commissioner's argument under section 2038 mirrors his argument under section 2036—that the attorneys-in-fact have controlled the entirety of Levine's affairs since 1996, and that this control includes the ability to "alter, amend, revoke or terminate" any aspect of the split-dollar arrangements. He argues again that the termination of the split-dollar arrangements would provide Levine—through her attorneys-in-fact—with complete control over the cash-surrender values of the policies, and the power to do this would fall within section 2038(a)(1). He argues that it applies to section 2038(a)(1) for the same reasons that

---

[28] Section 2036(a) also excepts from its sweep transfers that are *bona fide* sales for adequate and full consideration. We need not determine whether this exception applies.

39

he argues it applies to section 2036. We disagree for the same reasons and need not repeat them.

The cash-surrender values of the insurance policies are not includible under section 2038(a)(1) either.[29]

IV.     *Section 2703*

The Commissioner argues as a third alternative that the special valuation rules under section 2703 apply to Levine's split-dollar arrangement. Section 2703(a) provides:

Sec. 2703(a). General Rule.—For purposes of this subtitle, the value of any property shall be determined without regard to—

(1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or

(2) any restriction on the right to sell or use such property.

The Commissioner argues that when Levine—through her attorneys-in-fact—entered into the split-dollar arrangement, she placed a restriction on her right to control the $6.5 million in cash and the life-insurance policies. And the restriction on Levine's right to unilaterally access the funds transferred to the insurance companies for the benefit of the Insurance Trust is what should be disregarded when determining the value of the property under section 2703(a)(2).

The Estate argues that section 2703 applies only to property owned by Levine at the time of her death, not to property she'd disposed of before, or property like the insurance policies that she never owned at all. If the inability to surrender the life-insurance policies is considered a "restriction", it is not a restriction on any property rights held by Levine since she never owned the policies.

---

[29] Section 2038 also includes an exception for a "bona fide sale for an adequate and full consideration in money or money's worth." We need not decide whether this exception applies here.

The Commissioner doesn't parry this other argument, but argues instead that if we focus on the "rights" held by Levine under the split-dollar arrangement—and not the $6.5 million in cash—the result would remain the same. He wants to imagine that despite the different language in the split-dollar arrangement here compared to those in *Morrissette II* and *Estate of Cahill*, it should still be read to mean that both parties may consent to any early termination of the insurance policies. He says that without this restriction, the value of Levine's rights would equal the cash-surrender values of the life-insurance policies.

We disagree. Section 2703 does refer to "any property." But the "any property" it refers to is property of an estate, not some other entity's property. Our caselaw confirms the plain meaning of the Code, and tells us to confine section 2703's valuation rule to property held by a decedent at the time of her death. *See, e.g.*, *Estate of Strangi v. Commissioner*, 115 T.C. 478 (2000), *aff'd in part, rev'd in part*, 293 F.3d 279 (5th Cir. 2002). The district court in *Church v. United States*, 85 A.F.T.R.2d 2000-804 (W.D. Tex. 2000), *aff'd without published opinion*, 268 F.3d 1063 (5th Cir. 2001), rejected precisely this argument when it held that "property" in section 2703 consideration does not include assets that a decedent contributed to a partnership before her death, but only the partnership interest she got in exchange. *See also Estate of Strangi*, 115 T.C. at 488 ("Congress 'wanted to value property interests more accurately when they transferred, instead of including previously transferred property in the transferor's gross estate.'" (citing *Kerr v. Commissioner*, 113 T.C. 449 (1999), *aff'd*, 292 F.3d 490 (5th Cir. 2002))).

The property we have to value here is the property in Levine's estate, which is the split-dollar receivable she held at the time of her death. There were no restrictions on *that* property. She could do with the receivable what she wanted. She was free to sell it or transfer it as she wished. One needs to remember that what the Estate valued on its return was the receivable owned by Levine in her Revocable Trust. Section 2703 is not relevant to the valuation of the receivable because Levine had unrestricted control of it. Section 2703 therefore does not apply.

The only property left in the Estate after this arrangement was done was the split-dollar receivable. It is the value of *that* property that must be included in the gross estate, and the parties have agreed that its value is $2,282,195. The Estate having almost entirely prevailed, no accuracy-related penalties apply.

*Conclusion*

If there is a weakness in this transaction, it lies in the calculation of the value of the gift between Levine and the Insurance Trust—the difference between the value that her Revocable Trust gave to the Insurance Trust and what it got in return. But the gift-tax case is not this estate-tax case.

And the problem there is traceable to the valuation rule in the regulations. No one has suggested that this rule is compelled by the Code and, if it isn't, the solution lies with the regulation writers and not the courts. *See Carpenter Fam. Invs., LLC v. Commissioner*, 136 T.C. 373, 387 (2011).

*Decision will be entered under Rule 155.*